AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the

District of New Mexico

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Robert Jay Hernandez, a.k.a. RJ Hernandez | ) | Case No. 26-2039 MJ |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendant(s) | ) | |

FILED
UNITED STATES DISTRICT COURT
LAS CRUCES, NEW MEXICO

APR 27 2026

MITCHELL R. ELFERS
CLERK OF COURT

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___September 2024 to the present___ in the county of ___Doña Ana___ in the
_____ District of ___New Mexico___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1589(a)(1), (3), (4) | Forced Labor |
| 18 U.S.C. § 922(g)(1) | Felon in Possession of Firearm and Ammunition |
| 21 U.S.C. §§ 841(a)(1), (b)(1)(C) | Possession with Intent to Distribute Fentanyl |
| 18 U.S.C. §§ 1591(a), (b) | Sex Trafficking by Means of Force, Threats, Fraud, and Coercion |

This criminal complaint is based on these facts:
See attachment.

☑ Continued on the attached sheet.

_____
Complainant's signature

Lilly Aldana, FBI Special Agent
_____
Printed name and title

Sworn to before me and signed in my presence. _by telephone KS_

Date: 04-27-2026

_____
Judge's signature

City and state:       Las Cruces, New Mexico

Hon. Kevin R. Sweazea, U.S. Magistrate Judge
_____
Printed name and title

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Lilly Aldana, a Special Agent with the Federal Bureau of Investigation (FBI), being duly sworn, depose and state that there is probable cause to find that Robert Jay Hernandez, also known as RJ Hernandez, hereinafter **"Hernandez,"** committed the following federal criminal offenses:

18 U.S.C. §§ 1589(a)(3), (4) – Forced Labor:

From on or about September 2024 and continuing to on or about October 2024, in Doña Ana County, in the District of New Mexico, and elsewhere Hernandez did knowingly provide and obtain the labor and services of Victim 1 (1) by means of the abuse of law, threatened abuse of law and legal process; and (2) by means of a scheme, plan, and pattern intended to cause Victim 1 to believe that if he did not perform such labor and services that he would suffer serious harm, in violation of law.

18 U.S.C. § 922(g)(1) – Felon in Possession of Firearm and Ammunition:

From on or about September 2024 and continuing to on or about April 2026, in Doña Ana County, in the District of New Mexico, and elsewhere Hernandez, knowing that he had been convicted of at least one crime punishable by imprisonment for a term exceeding one year, specifically conspiracy to transport aliens for financial gain, knowingly possessed a firearm and ammunition in and affecting commerce.

21 U.S.C. §§ 841(a)(1), (b)(1)(C) – Possession with Intent to Distribute Fentanyl:

From on or about September 2024 and continuing to on or about April 2026, in Doña Ana County, in the District of New Mexico, and elsewhere Hernandez, unlawfully, knowingly and intentionally possessed with intent to distribute a controlled substance, and the violation involved a mixture and substance containing a detectable amount of fentanyl.

18 U.S.C. §§ 1589(a)(3), (4) – Forced Labor:

From on or about March 20, 2025, and continuing to on or about January 2026, in Doña Ana County, in the District of New Mexico, and elsewhere Hernandez did knowingly provide and obtain the labor and services of Victim 2 (1) by means of the abuse of law, threatened abuse of law and legal process; and (2) by means of a scheme, plan, and pattern intended to cause Victim 2 to believe that if she did not perform such labor and services that she would suffer serious harm, in violation of law.

18 U.S.C. §§ 1589(a)(1), (3), (4) – Forced Labor:

From on or about November 2025 and continuing to on or about February 2026, in Doña Ana County, in the District of New Mexico, and elsewhere Hernandez did knowingly provide and obtain the labor and services of Victim 3 (1) by means of force, threats of force, physical restraint, and threats of physical restraint to Victim 3; (2) by means of the abuse of law, threatened abuse of law and legal process; and (3) by means of a scheme, plan, and pattern intended to cause Victim 3 to believe that if she did not perform such labor and services that she would suffer serious harm, in violation of law.

18 U.S.C. §§ 1591(a) and (b) – Sex Trafficking by Means of Force, Threats, Fraud, and Coercion:

From on or about November 2025  and continuing to on or about February 2026, in Doña Ana County, in the District of New Mexico, and elsewhere Hernandez knowingly, in and affecting interstate commerce, recruited, enticed, harbored, transported, provided, obtained, and maintained by any means Victim 3, knowing and in reckless disregard of the fact that means of force, threats of force, fraud, coercion, and any combination of such means, would be used to cause Victim 3 to engage in a commercial sex act.

## Relevant Statutes

1.    Under 18 U.S.C. § 1589(a), **it is unlawful to "knowingly provide[ ] or obtain[ ] the** labor or services of a person by any one of, or by any combination of, the following means":

> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
>
> (2) by means of serious harm or threats of serious harm to that person or another person;
>
> (3) by means of the abuse or threatened abuse of law or legal process; or
>
> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

2.    **Under 18 U.S.C. § 922 (g)(1), "[i]t shall be unlawful for any person** . . . who has been convicted in any court of . . . a crime punishable by imprisonment for a term exceeding one year . . . to . . . **possess in or affecting commerce, any firearm or ammunition."**

3.      Under 21 U.S.C. § 841(a)(1), it is "unlawful for any person knowingly or intentionally ... to ... possess with intent to ... distribute ... a controlled substance," which includes fentanyl. The punishment for this offense is set forth in § 841(b)(1)(C).

4.      **Under 18 U.S.C. § 1591(a), it is unlawful to** "knowingly ... in or affecting interstate or foreign commerce . . . recruit[ ], entice[ ], harbor[ ], transport[ ], provide[ ], obtain[ ], advertise[ ], maintain[ ], patronize[ ], or solicits by any means a person . . . knowing, or . . .in reckless disregard of the fact, that means of force, threats of force, fraud, coercion . . . or any **combination of such means will be used to cause the person to engage in a commercial sex act." "The term 'commercial sex act' means any sex act, on account of which anything of value [including drugs] is given to or received by any person."** § 1591(e)(3). The punishment for this offense is set forth in § 1591(b).

## Probable Cause

5.      The Federal Bureau of Investigation (FBI) received information that Hernandez, who works as a bounty hunter for Zia Bail Bonds in Las Cruces, New Mexico, was bonding inmates out of Dona Ana County Detention Center (DACDC) and requiring them to live at his personal residence. The FBI was also informed that Hernandez would provide those he bonded out with drugs and then exploit them—many of whom were female drug addicts with little to no family support and few options for places to live. Specifically, he would require and coerce such individuals to (1) perform sexual acts in order to receive the drugs that they were addicted to so that they could avoid experiencing severe withdrawal symptoms; (2) engage in sexual acts by causing them to fear that he would return them to jail if they refused; and (3) perform other labor or services by causing them to fear that he would return them to jail if they failed to do what he asked.

A. **Victim 1**

6.     On or about September 24, 2024, Victim 1, a male inmate who did not have the proper documentation to stay in the United States, had been arrested and placed at DACDC. Shortly thereafter, Hernandez bonded Victim 1 out and informed him that one of the bond conditions was that Victim 1 would have to reside at Hernandez's residence—and would not be allowed to leave.

7.     While Victim 1 **stayed at Hernandez's residence,** Hernandez required Victim 1 to perform different labor and services for him, including requiring Victim 1 to perform various maintenance and repair work around Hernandez's **residence,** to perform yard work, and to assist Hernandez as in his capacity as a bounty hunter. Hernandez—who never paid or offered to pay Victim 1 for any of his work—required Victim 1, on numerous occasions and for many hours, to do bounty hunter work for Hernandez. As part of Victim 1's **bounty hunter duties, Hernandez** provided Victim 1 with a tactical vest, a handgun, handcuffs, and baton. Hernandez then required Victim 1 to drive Victim 1's personal vehicle around Las Cruces, New Mexico, and El Paso, Texas, on numerous occasions and look for other inmates to arrest for Hernandez.

8.     Hernandez also gave drugs to Victim 1 when Victim 1 had a minor burn injury on his arm. Hernandez claimed that a doctor had prescribed Victim 1 "morphine" **pills** to assist with the pain. Victim 1, however, never saw a doctor—or ever had anything prescribed to him while he was staying with Hernandez in September 2024 and October of 2024. Victim 1 stated that he did not know what the pills truly were—as the pills caused him to lose conciseness.

9.     Because the pills caused Victim 1 to lose consciousness, Victim 1 refused to take any more pills when Hernandez offered him more. As a result, Hernandez gave Victim 1 a fentanyl patch, which Hernandez stated had been prescribed by the doctor to assist Victim 1 with the pain.

However, Victim 1 stated that he never received a prescription for this or any other patch—so he removed the patch and contacted his wife (Witness 1). Below is a picture of the fentanyl patch that Hernandez gave to Victim 1:



10.    Witness 1, a U.S. citizen, arrived at Hernandez's residence and confronted Hernandez for providing Victim 1 with drugs, the living conditions, and requiring Victim 1 to live at Hernandez's residence. Witness 1 told Hernandez that nowhere in the bond conditions did it state that Victim 1 had to remain in Hernandez's residence. Hernandez then told Witness 1 that he was providing drugs to Victim 1—specifically morphine and a fentanyl patch—and that that Victim 1 was not required to reside at his residence. Hernandez told Witness 1 that he felt the need to "get back at people" and that excitement of revenge gave him pleasure. On the day of the confrontation, Victim 1 left Hernandez's home with Witness 1, and Witness 1 kept the fentanyl patch at evidence.

11.      Witness 1 had previously spent some nights at Hernandez's home in order to spend time with Victim 1.  While there, Witness 1 saw three firearms located in Hernandez's residence.  She observed that the three firearms were all handguns.  Once he left Hernandez's residence, Victim 1 would continue to report telephonically to Hernandez.  After Victim 1 left Hernandez's residence, Hernandez contacted the U.S. Immigration and Customs Enforcement (ICE) and informed them that Victim 1 was illegally present in the United States.  On November 20, 2024, while Victim 1 was outside of Hernandez's residence to report, ICE arrived and arrested Victim 1.

12.      Hernandez was previously convicted of a felony offense before he possessed the firearms noted above.  Specifically, he was convicted in 2017 in the Western District of Texas in case number 3:17cr833-PRM of one count of conspiracy to transport aliens for financial gain, in violation of 8 U.S.C. §§ 11324(a)(1)(A)(v)(I), (a)(1)(A)(ii) and (a)(1)(B)(i).  He was sentenced to three years of probation, a $1,500 fine, and a $5,000 fine under the Justice for Victims Trafficking Act.

13.      Based on my training and experience, and having conferred with other law enforcement agents who are familiar with firearms, it is highly likely that the firearms Hernandez possessed were manufactured outside of the state of New Mexico—and had thus travelled in interstate commerce before Hernandez possessed them.

**B.  Victim 2**

14.      On or about March 20, 2025, Hernandez reached out to Victim 2 via the chat application on the DACDC tablets.  As the conversation progressed, Hernandez discovered that Victim 2 was a drug addict and did not have a residence to live at or family members who were willing to help her.  Upon learning this information, Hernandez asked Victim 2 to stop to calling him "sir"—and to instead call him "RJ."  Hernandez then begins complimenting Victim 2 on her

looks and asked for Victim 2's social media information. Hernandez then began to look at Victim 2's social media account and began talking about her physical figure and what physical features of Victim 2 he likes best. Hernandez offered to have Victim 2 stay at his residence to assist Victim 2.

15. During another jail call, on or about March 24, 2025, Hernandez tells Victim 2 words to the effect of: "I will not kill you if you relapse because no one is perfect and that will happen, but I will not allow you to run from me. When I say it's time to go home, you must come." In a jail call on March 26, 2025, Hernandez told Victim 2 words to the effect of, "I'm looking forward to meeting you, to be with you. And if you run on me, I'm going to pay $5,000 for your little tiny ass. And I'll be mad, and I'm gonna go find you. I'm gonna pull you by your hair all the way to jail. I'm gonna handcuff you so tight that you're gonna have marks for a week." Later in that same call Hernandez also states, "Damn I love your pictures, and I can't wait to have you in person, so I can stop looking at your pictures."

16. Hernandez bonded Victim 2 out of DACDC on March 27, 2025, but Victim 2 did not go to Hernandez's residence—as she did not feel comfortable living with Hernandez after he had started calling Victim 2 his "wife." She reported that she had heard from other several other inmates that Hernandez makes inmates pay him with sexual acts. Hernandez eventually found Victim 2 while she was out walking. Upon finding her, Hernandez pointed a firearm at her and told her to get in the vehicle Hernandez was driving. (Although Hernandez is paralyzed from the legs down and uses a wheelchair, he drives vehicles using some sort of stick or lever to push the gas and break pedals with his arms.) During this arrest of Victim 2 for violating her conditions of release, Hernandez had an unknown male assistant him. (The unknown male did not want to

participate in the arrest, but Hernandez nevertheless required him to do it.)  Hernandez then took Victim 2 back to jail.

17.    Victim 2 was eventually bonded out of jail by someone else and stayed at that person's residence.  While living with that individual, Victim 2 called Hernandez and asked for a ride.  Hernandez then picked Victim 2 up and convinced her to stay at his residence.

18.    On June 24, 2025, Victim 2 was interviewed by Homeland Security Investigations regarding a separate investigation.  During the interview, Victim 2 was crying and stated that, while she was living at his residence, Hernandez required Victim 2 to sleep with him and caused her to fear that he would place her back in jail if she did not sleep with him.  Victim 2 also stated that he has cameras all over his home, both inside and outside of the residence.  After staying at his residence for some time, Victim 2 ran away.  Hernandez, however, had two females find Victim 2 and arrest her, and he had her placed her back in jail (as he became aware that she had a warrant for her arrest in Los Lunas).

19.    On or about January 18, 2026, Hernandez contacted Victim 2 on the video chat application on the DACDC tablets.  During the call, Hernandez told Victim 2 that he loves her and will never leave her.  Hernandez advised Victim 2 that there is nothing wrong with getting high and using drugs—because he is an addict himself.  Hernandez told Victim 2 that once she is released from jail, she will relapse, but that she would not be punished for relapsing.  He stated that Victim 2 should purchase a lot of fentanyl pills at once and then have someone she trusts hold the drugs for her and only provide those pills at the proper times.  Hernandez then stated that he could be that person for Victim 2.  Hernandez eventually bonded Victim 2 out of DACDC again— but she has fled from Hernandez, who is actively looking for her.  Victim 2's whereabouts are currently unknown.

C. <u>Victim 3</u>

20.    On or about November 17, 2025, Victim 3 was introduced to Hernandez while Victim 3 was incarcerated DACDC.  Shortly thereafter, Hernandez offered to bond Victim 3 out of jail and stated that, as a condition of her being bonded out, Victim 3 would be required to stay with him at his residence and always be with him.  Victim 3 stated that, while she lived at his residence, Hernandez required her to sleep in his room—and specifically to sleep on a bed that was positioned immediately next to Hernandez's medical bed.  Hernandez frequently told Victim 3 that she had "nice assets."  He also mentioned that he has cameras everywhere in his residence, including the bathrooms.

21.    On or about November 28, 2025, Hernandez also provided Victim 3 with cash so that Victim 3 could purchase fentanyl pills.  (In a March 8, 2026, text message to Victim 3 while she was incarcerated, Hernandez stated that the provided her with "over a thousand dollar " so that she could purchase these pills.)   Victim 3 further stated that Hernandez required her to purchase a big bag of fentanyl pills and that he would store the pills for her in a locked container—and he would decide when to give her the pills.  Victim 3 stated that, while living at Hernandez's residence, there were times when she would experience intense and prolonged pain and withdrawal symptoms without the fentanyl pills.  (Victim 3 stated that she had not previously been addicted to fentanyl—and only became addicted to it after Hernandez introduced it to her.)  Hernandez would make Victim 3 do certain things—including kissing him on the lips or on the cheek—to be permitted to have one or more of the fentanyl pills he was holding for her.  There were other occasions on which Hernandez would give Victim 3 so many pills that she would become unconscious—and then later wake up feeling pain in her vagina.

22.    On February 26, 2026, Hernandez gave Victim 3 permission to walk to the grocery store. However, Hernandez became upset with her because Hernandez felt she was taking too long. Hernandez then arrested Victim 3 and took her back to DACDC, telling her that the probation officer revoked the bond. The probation officer, however, told Victim 3 that Hernandez had been the one who revoked her bond. (While Victim 3 was incarcerated again, Hernandez told her that, although he loved her, he violated her conditions because she told his boss that he had raped her.)

23.    On or about March 2025, Victim 3 made several jail calls asking different people to help her get bonded out of jail before Hernandez bonds her out again—and explaining that Hernandez would continue to require her to live at his home. Shortly thereafter, Hernandez bonded her out and required her to live at his home.

24.    While Victim 3 has lived at Hernandez's residence, he has required her to wear certain attire and to undress and change her clothes in front of him. Hernandez would also make Victim 3 remove her bra before going to sleep and then Hernandez would rub breasts while she lay in the bed that was immediately next to his bed. Victim 3 did not want to sleep in the same room as Hernandez; sleep in a bed next to Hernandez's bed; undress in front of Hernandez; or have Hernandez rub her breasts. But she felt like she had no choice in any of these matters because she feared that Hernandez would send her back to jail if she did not do what he demanded—or if she refused to allow him to rub her breasts. She also knew that he would not give her the fentanyl pills if she did not allow this unwanted sexual touching. In addition, she feared that she would experience severe withdrawal symptoms if she did not receive these pills, which were given in exchange for allowing him to rub her breasts.

25.     On two separate occasions, Victim 3 woke up to Hernandez performing oral sex on her—despite her not wanting to have sex with him and never consenting, either explicitly or implicitly, to any such sexual contact by Hernandez.  While he was performing oral sex on her, he pinned her legs down with his upper-body weight and strength—and Victim 3 was unable to move away from him, despite her best efforts to forcefully push him away.

26.     At one point, Hernandez told Victim 3 that they would never believe any of her statements about him raping her because she is a drug addict.  Herandez also mentioned that people would also not believe her because she was never "tied down" and that the door to his residence is unlocked.  Victim 3, however, informed law enforcement that she has never felt free to leave Hernandez's residence because she is afraid of the consequences.  Specifically, she fears that if she upsets Hernandez, she could be sent back to jail.  She emphasized to law enforcement that she never wanted to have sex with him and that he had sex with her against her will.

27.     Text messages from other female inmates at DACDC have frequently referred to Hernandez as a "dirty" bondsman, and a "perverted old man," who bonds mostly female inmates out.  The inmates also state that he bonds females out who are "on the pill" (i.e., fentanyl) and that he does drugs with them.  In addition, the inmates have sent messages stating that Hernandez expects these females to "do some favors" (i.e., sexual favors) for him—which the inmates also refer to as "dirty favors" and "sucking dick."  The inmates also explicitly reference Victim 3 in their texts and state that Hernandez has sexually exploited Victim 3.

## Conclusion

28.     Probable cause exists to believe that Hernandez violated the following criminal statutes: (1) 18 U.S.C. §§ 1589(a)(1), (3), (4) (Forced Labor); (2) 18 U.S.C. § 922(g)(1) (Felon in Possession of Firearm and Ammunition); (3) 21 U.S.C. §§ 841(a)(1), (b)(1)(C) (Possession with

Intent to Distribute Fentanyl); and (4) 18 U.S.C. §§ 1591(a) and (b) (Sex Trafficking by Means of Force, Threats, Fraud, and Coercion).

29.    This affidavit has been reviewed by AUSA Grant Gardner.

Respectfully submitted,

Lilly Aldana
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on ⟨27⟩ April, 2026.

Honorable Kevin R. Sweazea
UNITED STATES MAGISTRATE JUDGE